IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2022

**IN RE BENTLEY J. ET AL.**

**Appeal from the Juvenile Court for Pickett County**
**No. 2021-JV-1588, 2021-JV-1589          James Reed Brown, Judge**

———————————————————

**No. M2022-00077-COA-R3-PT**

———————————————————

This is a termination of parental rights case involving two minor children. Mother and Father appeal the trial court's order terminating their parental rights to the children on multiple bases. Having reviewed the record on appeal, we affirm the ruling of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Racquel H. Hawley, Byrdstown, Tennessee, for the appellant, Amanda J.

Victoria J. Grelle, Livingston, Tennessee, for the appellant, Christopher B.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Emily E. Wright, Livingston, Tennessee, Guardian ad Litem.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

Bentley J.[1] was born in February of 2018 to Amanda J. ("Mother"). Adryan J. was born to Mother in June of 2020. Christopher B. ("Father") is the biological father of

---

[1] This Court has a policy of protecting the identities of parties involved in parental termination cases.

Bentley and Adryan (collectively, "Children").[2] The circumstances giving rise to this matter occurred on the day of Adryan's birth. Upon arriving at the hospital to give birth, Mother tested positive for "methamphetamine and buprenorphine." The Department of Children's Services ("the Department") thereafter received a referral with allegations of a drug-exposed child. When questioned, Mother denied drug use. However, she disclosed she had a prescription for suboxone but had "weaned down" after learning she was pregnant. At the time of Adryan's birth, Father was incarcerated in Kentucky. He subsequently pleaded guilty to first-degree assault and burglary and was sentenced to serve two concurrent twenty-year sentences on these charges. Later, the Department case manager learned that Adryan had tested positive for "methamphetamines and amphetamines." The Department case manager questioned Mother about the positive results, but Mother denied using methamphetamine. The Children were taken into the Department's custody on June 29, 2020, and have remained in foster care since. Once the Department obtained custody of the Children, it administered a hair follicle drug screen on Bentley. The results showed that he was also positive for methamphetamine.

A permanency plan was later developed on July 14, 2020. Pursuant to this plan, Mother and Father were required to, among other things, submit to and pass drug screens; pay child support; complete a drug and alcohol assessment and follow all recommendations thereof; complete a mental health assessment; attend all scheduled visitations and arrive on time; provide for the Children's needs during scheduled visitations; and obtain and maintain appropriate housing.[3]

In an order dated November 23, 2020, the Children were adjudicated dependent and neglected by the Juvenile Court of Pickett County, Tennessee. In its order, the Juvenile Court found the Children to be victims of severe child abuse perpetrated by Mother. This order would later be entered into evidence during the trial of the termination proceedings that are presently at issue.

Subsequent to the Children's removal from her custody and placement in foster care, Mother continued to abuse drugs, testing positive for methamphetamine once again on March 6, 2021. Mother did not complete a mental health treatment or a drug abuse treatment, and, in May of 2021, she was incarcerated in Kentucky on a charge of trafficking a controlled substance in the first degree. Mother pleaded guilty to the charge and received a sentence of seven and a half years, which was mostly suspended to be served on probation.

---

[2] The Children were born during Mother's marriage to another man, Charles E. However, DNA testing confirmed that Father was indeed the Children's biological father. In July of 2020, Charles E. executed documents waiving any parental rights to the Children, while also waiving any rights to notice of legal proceedings regarding the Children. According to the record on appeal, Mother and Charles E. remained married as of the date of these proceedings.

[3] This permanency plan was later revised in January of 2021 and June of 2021, however, Mother and Father's responsibilities remained largely the same.

On August 3, 2021, the Department filed a "Petition to Terminate Parental Rights" ("Petition") regarding both Mother and Father.[4] In this Petition, the Department alleged, as against Mother, severe child abuse pursuant to Tennessee Code Annotated sections 36-1-113(g)(4) and 37-1-102(b)(27). Concerning Father, the Department alleged the ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(6), which is implicated when a parent receives a ten-year prison sentence. In addition to the allegations asserted against Mother and Father, the Petition noted the "healthy parental attachment" formed between the Children and their foster parents and that the foster parents wished to adopt the Children. A trial was held on November 18, 2021. The day prior to trial, Mother had filed a motion asking for a continuance so that she could attend the trial in person after her release from incarceration.[5] The trial court denied the motion, noting the amount of time that the Children had been in state custody, the untimeliness of the motion, and Mother's ability to participate in the trial via video conference.

In an order dated December 17, 2021, the trial court made various findings of fact and conclusions of law, ultimately determining that the Department had proven by clear and convincing evidence that there existed grounds to terminate both Mother and Father's parental rights as to the Children. It further determined, by clear and convincing evidence, that it was in the best interest of the Children to terminate Mother and Father's parental rights. A final order setting forth these findings was entered on December 21, 2021. This appeal followed.

## ISSUES PRESENTED

Mother and Father each raise issues on appeal. Presented together, these issues are restated as follows:

1. Whether the Juvenile Court's denial of Mother's motion for a continuance deprived her of due process.
2. Whether the Department failed to "provide reasonable efforts" to Father prior to the filing of the termination petition.
3. Whether the trial court erred in terminating Father's parental rights pursuant to the ground of receiving a ten-year sentence.
4. Whether there exists clear and convincing evidence that termination of Mother and Father's parental rights was in the Children's best interests.

Although Mother does not assert a challenge to the termination ground found against her by the trial court, we will, as discussed below, also consider this issue.

---

[4] An "Amended Petition to Terminate Parental Rights" was subsequently filed on August 19, 2021, alleging the same grounds against Mother and Father for termination of their rights.
[5] Although this motion does not specifically appear in the record, there appears to be no dispute that Mother filed it. In fact, as discussed herein, the trial court's termination order specifically references the motion and its denial of same.

## STANDARD OF REVIEW

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010)). Although this right is considered to be both fundamental and constitutionally protected, it is not absolute. *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). This right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). "[T]he state as *parens patriae* has a special duty to protect minors," *Hawk v. Hawk*, 855 S.W.2d 573, 580 (Tenn. 1993) (quoting *Matter of Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)), and "Tennessee law . . . thus . . . upholds the state's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Id.*

Under Tennessee law there exist "[w]ell-defined circumstances . . . under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). These circumstances are statutorily defined. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005)). "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "'Clear and convincing evidence' is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007).

Due to this heightened burden of proof, we must adapt our customary standard of review:

> First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.

*In re Audrey S.*, 182 S.W.3d at 861.

**DISCUSSION**

*Mother's Motion to Continue*

Mother's first issue on appeal concerns the trial court's denial of her motion for a continuance of the trial. "The granting or denial of a motion for a continuance lies in the sound discretion of the court. The ruling on the motion will not be disturbed unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *State Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 317 (Tenn. Ct. App. 2008) (quoting *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997)).

On appeal, Mother argues that the trial court's denial of her motion to continue deprived her of due process. "Due process is a flexible concept that 'calls for such procedural protections as the particular situation demands.'" *In re Trinity S.*, No. E2021-00098-COA-R3-PT, 2021 WL 3486188, at *3 (Tenn. Ct. App. Aug. 9, 2021) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "The basic principle of due process . . . 'is that individuals be given an opportunity to have their legal claims heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 407 (Tenn. 2013)). In requesting a continuance, the burden falls on Mother to "establish[] the circumstances that justif[ied] the continuance." *In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019) (citing *Osagie v. Peakload Temp. Servs.*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002)). "Decisions regarding the grant or denial of a continuance are fact-specific and 'should be viewed in the context of all the circumstances existing' at the time of the request." *Id.* (quoting *Nagarajan v. Terry*, 151 S.W.3d. 166, 172 (Tenn. Ct. App. 2003)). These circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (quoting *Nagarajan*, 151 S.W.3d at 172).

In the present case, Mother was served with the termination petition on August 25, 2021. At that time, Mother had been incarcerated for about three months. On October 25, 2021, while Mother remained incarcerated, the trial court entered an agreed order, setting trial for November 18, 2021. This agreed order was approved for entry by *all* counsel involved, including Mother's counsel. On November 17, 2021, the day before the trial was to begin, Mother filed a motion asking for a continuance. Although, as noted in an earlier footnote, this motion is absent from the record on appeal, it appears from the trial transcript that the motion was predicated primarily on Mother's desire to attend the trial in person subsequent to her release from incarceration.[6] The trial court ultimately denied the motion, stating:

---

[6] The transcript of the hearing also reflected that counsel for Mother argued for a continuance in order to have more time for preparation.

The Court is going to deny the motion to continue. The factors that the Court has considered is the amount of time that the children have been in state's custody. The lateness of the motion, the fact that I only saw it today. . . . And also, another factor is that the mother is able to be present today by Zoom and be able to be – and be able to hear the hearing and participate in that manner.

We find no issue with the trial court's denial of Mother's motion to continue. As to Mother's desire to appear at the trial in person, she is not afforded an absolute right to appear at the termination proceedings in person. As this Court has previously explained:

> In the context of a parental termination hearing, this Court has observed that "due process requires the trial court to provide the prisoner defendant with meaningful access to the court and an opportunity to be heard." "Incarcerated parents, however, 'have no absolute right to be in attendance at the hearing of a civil matter.'"

*In re S.H.*, No. E2013-02007-COA-R3-PT, 2014 WL 1713769, at *5 (Tenn. Ct. App. Apr. 29, 2014) (internal citations omitted); *see also* Tenn. Code Ann. § 36-1-113(f)(3) (providing that before an incarcerated parent's parental rights are terminated, it must be shown that the parent received notice "[t]hat the incarcerated parent or guardian has the right to participate in the hearing and contest the allegation that the rights of the incarcerated parent or guardian should be terminated, and, at the discretion of the court, such participation may be achieved through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances"). Here, Mother was afforded an opportunity to participate during trial via Zoom, and she did so. Therefore, we find her argument that the denial of her motion constituted a violation of due process is without merit.

To the extent Mother maintains that a continuance should have been granted to allow for more trial preparation, we are similarly dissuaded. Specifically, we note that her motion to continue was not filed until the *day prior to trial*, and there is no indication that Mother, who had the benefit of counsel, attempted to obtain a continuance prior to this. Furthermore, we also acknowledge that Tennessee Code Annotated section 36-1-124(a) provides that,

> [i]n all cases where the termination of parental rights or adoption of a child is contested by any person or agency, the trial court shall, consistent with due process, expedite the contested termination or adoption proceeding by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority in setting a final hearing of the proceeding and shall be heard at the earliest possible date over all other civil

- 6 -

litigation other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

Tenn. Code Ann. § 36-1-124(a). Thus, it is clear that termination cases are to be expedited where possible. As such, in light of the foregoing discussion, we do not find that the trial court abused its discretion in denying Mother a continuance.

*Severe Child Abuse*

Although Mother does not appeal the trial court's finding of severe child abuse as a ground for termination, we are required to review the ground in accordance with our Supreme Court's mandate from *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *Id.* at 511.

Pursuant to Tennessee Code Annotated section 36-1-113(g)(4), termination of parental rights may be based upon a determination that "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). Here, in an order entered by the Juvenile Court of Pickett County on November 23, 2020, the court found that the Children were victims of severe child abuse by Mother as defined in Tennessee Code Annotated section 37-1-102(b). This order was entered into evidence at trial. Accordingly, we find no error in the trial court's finding of severe child abuse as against Mother as a ground for termination of her parental rights.

*Reasonable Efforts*

Father's first issue on appeal, which invokes the authority of Tennessee Code Annotated section 37-1-166, concerns his contention that the Department failed to provide him reasonable efforts as to reunification with the Children. Tennessee Code Annotated section 37-1-166(a) provides that "[a]t any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall first determine whether reasonable efforts have been made to: (1) Prevent the need for removal of the child from such child's family; or (2) Make it possible for the child to return home." Tenn. Code Ann. § 37-1-166(a). Section 37-1-166(b) goes on to provide that "[w]henever a juvenile court is making the determination required by subsection (a), the department has the burden of demonstrating that reasonable efforts have been made to prevent the need for removal of the child or to make it possible for the child to return home." Tenn. Code Ann. § 37-1-166(b).

Father predicates his argument, albeit brief, on the fact that, in this case, an employee of the Department testified during the trial that the Department did not make any efforts to reunify Father and the Children as a result of his out-of-state incarceration. Concerning Father's argument in general, we observe that the Supreme Court has stated as follows:

[N]othing in the plain language of Section 36-1-113 indicates that a petitioner in a proceeding to terminate parental rights is in fact required to put on proof of [the Department's] reasonable efforts to assist the respondent parent. Rather, the language of the statute indicates only that the trial court is to consider [the Department's] reasonable efforts, or lack thereof, in determining whether termination of the parent's rights is in the child's best interest. Likewise, Section 37-1-166, which details [the Department's] obligation to make reasonable efforts in a dependency and neglect proceeding, contains no language indicating that proof of reasonable efforts is required in a termination proceeding. In cases in which [the Department] removes a child from the home, Section 37-1-166 generally directs [the Department] to make reasonable efforts to reunify the parent with the child unless [the Department] can show that it is not required to do so. Nothing in Section 37-1-166, however, addresses proof on reasonable efforts in a *termination* proceeding.

*In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015) (internal citations omitted). Accordingly, we find that Father's reliance on Tennessee Code Annotated section 37-1-166 is misplaced. As such, we find no error in this regard. Notably, as indicated above, reasonable efforts may be considered in whether termination is in the Children's *best interests*.

*Father's Prison Sentence*

Father also argues that the trial court erred in terminating his parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(6) due to his incarceration serving a ten-year sentence. Tennessee Code Annotated section 36-1-113(g)(6) provides that a ground for termination may be found where "[t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court." Tenn. Code Ann. § 36-1-113(g)(6).

In the case at bar, Father was incarcerated in Kentucky as a result of a guilty plea to a charge of burglary in the first degree and complicity to assault in the first degree in June of 2021. Father received two twenty-year sentences that were to be served concurrently. The Children were both under eight years of age at the time of sentencing. In accordance with the statute, this ground has been satisfied.

In reaching this conclusion, we find no merit in Father's argument that the trial court erred in terminating his parental rights pursuant to this ground because it failed to make a finding of wanton disregard for the Children's welfare at the time the offense resulting in incarceration was committed. Father's argument relies on Tennessee Code Annotated section 36-1-102(1)(A)(iv), which is satisfied by, in addition to other findings, a finding that the parent "engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). Here, Father conflates two separate grounds for termination and attempts to apply standards relevant to the ground set forth in section 36-1-102(1)(A)(iv) to the ground for termination actually established against him. Indeed, as we noted above, Father's parental rights as to the Children were terminated pursuant to section 36-1-113(g)(6). This ground does *not* require a finding of wanton disregard. In contrast, Father's argument as to section 36-1-102(1)(A)(iv) is applicable to the ground of *abandonment*, which is found in section 36-1-113(g)(1). This ground was neither alleged nor found against Father and is not applicable to the analysis contained herein. Accordingly, we find no error in the trial court's termination of Father's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(6).

*Best Interests of the Children*

Once it is determined that a ground exists for terminating a party's parental rights, the focus then shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated section 36-1-113(i) provides a non-exhaustive list of factors for the courts to consider in determining whether termination is in the child's best interest, as follows:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1).

The Supreme Court has previously stated:

> "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."
>
> When conducting the best interests analysis, courts must consider . . . [the] statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceedings is free to offer proof of any other factor relevant to the best interests analysis. Facts considered in the best interests analysis must be proved by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's rather than the parent's perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child."

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (internal citations omitted). Making a determination as to a child's best interest "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s . . . factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

In its order, the trial court determined that it was in the Children's best interests for the parental rights of both Mother and Father to be terminated. In consideration of the factors codified in the statute, it found as follows:

1. Termination of parental rights will have a positive impact on the children's critical need for stability and continuity of placement through the children's minority. Termination of parental rights will allow the

- 11 -

foster parents to adopt the children and provide stability for the children. The children have been with the foster parents for seventeen months. Adryan has been with the foster parents since he was six days old. On the other hand, [Father] will be incarcerated for a long period of time. [Mother] has not addressed her issues with drugs and criminality and there is nothing to indicate that she could provide a stable environment for the children anytime soon.

2. A change in caregiver and physical environment is likely to have a negative impact on the children's emotional condition. The children have become bonded to the foster parents and breaking that bond would likely have a serious negative [e]ffect on the children's emotional condition.

3. [Father] and [Mother] have not demonstrated continuity and stability in meeting the children's basic material, educational, housing, and safety needs. [Father] remains incarcerated and unable to provide anything for the children and [Mother] continues to commit crimes that result in her incarceration and unable to provide for the children's needs.

4. [Mother] and [Father] do not have a secure and healthy parental attachment with the children and there is no reasonable expectation that either parent could create such attachment. The children have no emotional attachment to [Mother] and [Father]. [Mother] and [Father] have not had regular visits with the children, and it has been months since either parent has seen the children. [Father] will be incarcerated for some time and [Mother] has not addressed her issues of drug abuse or criminal activity. There is little chance that [Mother] could make it safe and in the best interests of the children to return to her home.

5. [Mother] and [Father] have not maintained regular visitation or other contact with the children, and they have not used the visitation or other contact to cultivate a positive relationship with the children. It has been so long since there has been any contact between the children and [Mother] . . . that there is no secure and healthy attachment. [Father] has only had one video conference with the children since he has been incarcerated.

. . . .

7. Whether the children have created a healthy parental attachment with another person or persons in the absence of the parent. The children in this case have been with the foster family for the duration of the dependent and neglect case. The children have strong emotional ties with the foster family in the absence of the parents.

8. Whether the children have created emotionally significant relationships with persons other than parents and caregivers. The children have

emotionally significant relationships with the foster family's extended family.

9. [Mother] and [Father] have not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the children to be in the home of either parent. [Mother] has not addressed her issues of drug abuse or criminal activity. There is little chance that [Mother] could make it safe and beneficial for the children to return home. [Father] has been incarcerated and is expected to remain incarcerated for many years.

10. [Mother] has not taken advantage of the programs that were offered to her by the department. The Department has set up alcohol and drug assessments, drug rehabilitation programs, parenting programs, and psychological treatment for [Mother]. [Mother] has not reciprocated those efforts and she has failed to complete any of the programs offered.

11. The Department has made reasonable efforts by setting up alcohol and drug assessments, drug rehabilitation programs, parenting programs, and psychological treatment for [Mother].

12. [Mother] has not demonstrated an urgency in establishing a parenting relationship with the children. She has continued her use of drugs and continued her criminal activity and awarding custody to her would be unsafe and not in the children's best interests.

13. [Mother] has shown physical abuse toward the children in that her children both tested positive for methamphetamine.

. . . .

15. [Mother] has not demonstrated an understanding of the basic and specific needs required for the children to thrive. She has continued in her drug use and criminal activity.

16. [Mother] has not shown a commitment or the ability to create a home that meets the needs of the children and allows them to thrive.

17. The physical environment of [Mother]'s home is not safe. One of the main reasons that the children were removed was that Adryan was born with methamphetamine in his system and Bentley tested positive for methamphetamine on a hair follicle drug test shortly after entering foster care.

18. [Mother] and [Father] have provided no financial support for the children.

19. The emotional and mental fitness of [Mother] and [Father] would be detrimental to the care of the children.

(internal citations omitted) Accordingly, in light of the foregoing findings, the trial court determined that the Department had proven, by clear and convincing evidence, that it was

in the Children's best interests for the parental rights of both Mother and Father to be terminated. Having reviewed the record on appeal, we agree with the trial court's conclusion.

In her brief on appeal, Mother sets forth numerous contentions as to why she believes the trial court erred in its best interests consideration. Of note, Mother maintains that, contrary to the trial court's finding, she did in fact have a "secure and healthy parental attachment" with the Children and that Bentley had developed an emotional connection with his biological siblings. We find Mother's argument to be without merit as it appears inapposite to the record on appeal. In fact, a caseworker from the Department testified that *neither* of the Children had any attachment with Mother. Moreover, we note that, despite her contentions of attachment, Mother's last visit with the Children occurred in February of 2021—**nine months** prior to the trial. When Mother did have scheduled visits with the Children, she was either late or missed the visits altogether. The same caseworker also testified that the Department was never able to perform home visits with Mother and that Mother has barely been involved or supported the Children since their removal, other than bringing diapers to visits. Mother was also not involved with the Children's therapy or education, nor had she paid any child support. Mother argues that, contrary to the trial court's finding, she had provided Bentley with "safe and stable care" for the first two years of his life. We find this contention to be without merit considering Bentley was exposed to and tested positive for methamphetamine. Clearly, this does not constitute a "safe and stable" environment. In contrast with their relationship with Mother, both the Children have formed healthy familial bonds with their foster family and the foster family's surrounding community and friends. In light of the evidence contained in the record, we agree with the trial court that there is clear and convincing evidence to support terminating Mother's parental rights as to the Children.

In his brief, Father predicates his contention that it was not in the Children's best interests that his parental rights be terminated on his prior argument that the Department failed to provide him with reasonable efforts. As we indicated earlier, although the Department does not have to provide proof of reasonable efforts in a termination proceeding, reasonable efforts may be considered in ascertaining whether termination is in the Children's best interests. However, in light of the trial court's findings as to other pertinent best interests factors, we do not find Father's argument sufficient so as to warrant a reversal of the trial court's determination in this regard, particularly in light of Father's ongoing lengthy sentence of incarceration and the testimony at trial that neither of the Children have exhibited any form of attachment to Father. Moreover, Father has not been involved in any aspect of the Children's lives including their education or therapy or provided any support. In fact, he has only had one visit with them since his incarceration and has only seen the youngest child, Adryan, one time. On the other hand, as we noted earlier, both Children have healthy parental attachments to the foster parents and the surrounding community. As to the evidence contained in the record, we agree with the trial court that there is clear and convincing evidence that termination of Father's parental

rights is in the best interests of the Children.[7]

## CONCLUSION

Based on the foregoing, we affirm the trial court's termination of Mother and Father's parental rights as to the Children.


s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE

---

[7] In his brief, Father also contends that the trial court's finding that his emotional and mental fitness would be detrimental to the care of the Children was not supported as there were no allegations of this as to Father. We agree. Based on our review of the record, it appears that Father's mental and emotional fitness was not appropriately analyzed. Nevertheless, we find the remaining factors as analyzed by the trial court as pertaining to Father to be sufficient to support a finding that it is in the Children's best interests that his parental rights be terminated.